**KANE GAS LIGHT AND HEATING COMPANY, Appellant in No. 82–5114, Cross-Appellee in No. 82–5115**

v.

**INTERNATIONAL BROTHERHOOD OF FIREMEN AND OILERS, LOCAL 112, Appellee in No. 82–5114, Cross-Appellant in No. 82–5115.**

**Nos. 82–5114, 82–5115.**

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit Rule 12(6) July 22, 1982.

Decided Aug. 12, 1982.

Rehearing and Rehearing En Banc Denied Sept. 10, 1982.

John W. English, John A. Bowler, Erie, Pa., for appellant, cross-appellee.

Jonathan Walters, Kirschner, Walters & Willig, Philadelphia, Pa., for appellee, cross-appellant.

Before SEITZ, Chief Judge, and ADAMS and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge.

In this appeal we are asked by the Kane Gas Light and Heating Company ("the Company") to vacate an arbitrator's award which, after imposing relatively minimal sanctions, reinstated an employee whom the Company had discharged. Were we to sit as the initial factfinders in determination of whether Alan Pritchard, the employee,

should be discharged, we would be hard pressed to justify his re-employment. In fact, however, the scope of our review in this case is an exceedingly narrow one, and employing that standard, we conclude that we are obliged to enforce the arbitrator's award, whatever misgivings we may have about its merits or wisdom. We also decline to disturb the district court's denial of attorney's fees to the Union which prevailed in this action brought by the Company. Thus, we affirm.

### I.

The Company is a natural gas public utility providing service to approximately 3200 customers, most of which are residences, in the Boroughs of Kane and Mount Jewett, Pennsylvania. The flow of gas into the Borough of Kane is controlled by a system of valves at the Mount Jewett Regulator Station ("the Station"), for which Alan Pritchard, an employee of the Company for seven years, was responsible. This Station had two principal valves. One was a "by-pass valve," which could be opened to increase the gas flow at times of increased demand for gas; the other was a "main valve," which was used only if it became necessary for testing or repair purposes to shut off the main gas transmission line entirely. (App. at 74a, 281–83a).

On the morning of February 9, 1979, Pritchard opened the by-pass valve on the instructions of the foreman in order to accommodate the need for an increased flow of gas due to the extremely cold weather at the time. Several hours later, the gas pressure had risen back to its normal level and the foreman told Pritchard to close the by-pass valve. When he returned to the Station, however, Pritchard not only shut off the by-pass valve, but he also closed the main valve even though he had not been instructed to do so.[1] In closing the main valve, Pritchard effectively cut off gas service to the entire Borough of Kane at a

---

1. While it is not clear from the record why Pritchard shut the main valve, apparently the Company contends that the reason was Pritch- ard's dislike of the foreman. (See App. at 13a– 14a).

time when the temperature stood at ten degrees below zero (App. at 314a, 323a). Although he failed to inform anyone that he had closed the main valve, Company officials soon noticed that the gas pressure in Kane was dropping, and sent the foreman to the Station to find out why that was happening.[2] Upon arriving at the Station, the foreman discovered that the main valve had been closed; he immediately reopened the valve and restored the gas pressure to its proper level. (App. at 179a–85a).

Considering the severity of the weather, Pritchard's actions in closing the main valve could easily have resulted in danger to life as well as substantial property damage. Indeed, as the President of the Company outlined in his testimony at the arbitration hearing:

> There was a potential for explosion and real disaster. If it hadn't happened that the meters were being monitored at that specific time carefully, we could have had a whole section of Kane lose gas, and the gaslights would go out, creating the possibility that if gas then went on, there would be explosions and fires, or at least that if they went out, that whole section of Kane in the middle of winter would have had to have been cut off, and all of the appliances then relit, according to procedures, which is a monumental task and a very dangerous one.

(App. at 97a).

In light of the seriousness of Pritchard's action, the Company decided, after reviewing all of the circumstances surrounding the closing of the main valve, that there was proper cause to discharge Pritchard. (App. at 81a–82a). The Company premised its decision to fire Pritchard on Article 1, Section 1 of its Collective Bargaining Agreement with Local 112, which provides:

> The Company retains the right to manage its operations and its direction of the work forces, including the right to make rules and regulations; hire; suspend; *discharge for proper cause*; . . .

(Joint Exhibit A). Pritchard's actions, according to the Company, constituted insubordination, sabotage, and deliberate restriction of output. Under the Company's "Rules of Conduct for Union Employees" (*see* Joint Exhibit H), each of these violations carried a maximum penalty of discharge for the first offense.

After Pritchard was fired, the Union filed a grievance on his behalf. Subsequently, the President of the Company met with Pritchard and a Union representative to discuss the matter further. At that meeting, however, Pritchard failed to give an explanation as to why he had closed the main valve. After further review, therefore, the Company not surprisingly reaffirmed its decision to fire Pritchard.

The Union continued to contest the Company's action, and eventually both the Company and the Union agreed voluntarily to submit the dispute to arbitration by the American Arbitration Association. This step was taken despite the absence of any provision for arbitration of grievances in the collective bargaining agreement.[3] Both the Union and the Company agreed that the question submitted to the arbitrator was whether Pritchard was discharged for proper cause within the meaning of the parties' collective bargaining agreement and the Company's Rules of Conduct, and indeed the parties framed their arguments

---

**2.** The Company officials attempted to get in contact with Pritchard to ask him what was going on, but Pritchard was apparently on the telephone making a long distance phone call at the time and could not be reached.

**3.** In arguing that the arbitrator failed to base his decision on the terms of the contract, and that the arbitrator's decision is contrary to public policy, the Company asserts in passing that it never agreed to *binding* arbitration. *See* Supplemental Reply Brief of the Company, at 4. Whatever statements may be contained in the affidavits the Company filed in the district court, however, *see* Appendix at 39a–40a, 321a, the Company has not argued before this court that the district court had no basis for its finding that "[b]oth parties agree that there are no disputes of material fact and therefore the matter is ripe for determination by the court" (App. at 41a). The propriety of the district court's decision to resolve the matter on summary judgment is therefore not at issue on this appeal.

to the arbitrator in those terms. (App. at 13a).[4]

After a hearing held in October and November of 1979, the arbitrator found in a decision dated March 10, 1980, that Pritchard had acted "errantly, beyond his assigned authority, and beyond the scope of his Foreman's orders" (App. at 15a), and that Pritchard's actions warranted a severe penalty. Nevertheless, the arbitrator ruled that the discharge was improper because Pritchard had not acted intentionally or for the purpose of restricting the flow of gas. Concluding that the record established that Pritchard's actions constituted reckless inadvertence, the arbitrator ordered that Pritchard be reinstated with back pay, with the reinstatement order to take effect thirty days following Pritchard's date of discharge. He further ordered that the period running from the date of discharge to the date of reinstatement be treated as a disciplinary suspension. (App. at 15a–17a).

Dissatisfied with the award, the Company brought this action in district court on April 9, 1980, seeking an order upholding the firing of Pritchard and vacating the arbitrator's award for manifest disregard of the law and facts. The Union filed a counterclaim, seeking enforcement of the arbitrator's award. Emphasizing the limited scope of judicial review of labor arbitration awards, the district court declined to vacate the award and entered summary judgment for the Union on December 19, 1980.

The Company then took an appeal (at No. 81–1208) from the district court's order. Because the district court had specifically reserved consideration of the Union's petition for attorney's fees until a later time, however, this court, 673 F.2d 903, dismissed the Company's appeal for want of an appealable order, citing the then prevailing rule of *Croker v. Boeing Co.*, 662 F.2d 975 (3d Cir. 1981).[5] Subsequently, the district court entered an order on December 23, 1981, rejecting the Union's petition for attorney's fees. The Company once again appealed (at No. 82–5114) from the order of the district court, and the Union cross-appealed (at No. 82–5115) in order to contest the denial of its petition for attorney's fees.

## II.

In support of its appeal, the Company presents two principal contentions.[6] First, the Company asserts that in ordering Pritchard's reinstatement, the arbitrator disregarded the terms of the collective bargaining agreement, which were binding upon him, and rendered a decision that was arbitrary and capricious. Second, the Com-

---

**4.** In its demand for arbitration, the Union characterized the nature of the dispute as "the discharge of Alan Pritchard," and sought as a remedy the reinstatement of Pritchard "with full back pay and all other emoluments." (Joint Exhibit F). In a letter dated July 3, 1969, and addressed to the American Arbitration Association (App. at 321a), the Company acknowledged the Union's request for arbitration and stated that it agreed to arbitration. The Company noted only one difference with the Union's demand, pointing out that this arbitration arose out of a special agreement between the parties and was not undertaken pursuant to the terms of any collective bargaining agreement.

**5.** Since that time the Supreme Court has decided *White v. New Hampshire Department of Employment Security,* 455 U.S. 445, 102 S.Ct. 1162, 71 L.Ed.2d 325 (1982) (motion for attorney's fees raises legal issues collateral to the merits of the main cause of action and so need not be made within the 10-day period allowed by Fed.R.Civ.P. 59(e) for motions to alter or amend judgment). In *Halderman v. Pennhurst*

*State School & Hospital,* 673 F.2d 628, 644 (3d Cir.) (Sur Petition for Rehearing), *cert. granted,* ―― U.S. ――, 102 S.Ct. 2956, 73 L.Ed.2d 1348 (1982), this court held that *White* "overrules the portion of our opinion in *Croker* dealing with appealability when [an] application for attorney's fees [has not been] fully determined."

**6.** The Company has also asserted that the district court erred in failing to apply the standard of review of labor arbitrations set forth in Pa. Stat.Ann. tit. 43, § 213.13 (Purdon). It is well settled, however, that in suits brought under § 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), which forms the jurisdictional predicate for the Company's action, *federal* law provides the rule of decision. *Textile Workers of America v. Lincoln Mills,* 353 U.S. 448, 456, 77 S.Ct. 912, 917, 1 L.Ed.2d 972 (1957). *See also Ludwig Honold Mfg. Co. v. Fletcher,* 405 F.2d 1123, 1127 & n.22 (3d Cir. 1969).

pany argues that because the arbitrator's award undermines the important public policy in favor of promoting the safe delivery of natural gas service, that award must be vacated even if it does not conflict with the terms of the collective bargaining agreement. We address each contention in turn.

## A.

In *Ludwig Honold Mfg. Co. v. Fletcher*, 405 F.2d 1123 (3d Cir. 1969), this court established a narrow standard for reviewing arbitrators' decisions, ruling that

> [t]he interpretation of labor arbitrators must not be disturbed so long as they are not in "manifest disregard" of the law, and that [raising the issue] "whether the arbitrators misconstrued a contract" does not open the award to judicial review.

> Accordingly, we hold that a labor arbitrator's award does "draw its essence from the collective bargaining agreement" if the interpretation can in any rational way be derived from the agreement, viewed in the light of its language, its context, and any other indicia of the parties' intention. . . .

*Id.* at 1128 (footnotes omitted). *See NF&M Corp. v. United Steelworkers of America*, 524 F.2d 756 (3d Cir. 1975); *Amalgamated Meat Cutters Local 1905 v. Cross Bros.*, 518 F.2d 1113 (3d Cir. 1975); *Textile Workers Union of America v. Cast Optics Corp.*, 464 F.2d 577 (3d Cir. 1972); *Local 616, International Union of Electrical, Radio, & Machine Workers v. Byrd Plastics*, 438 F.2d 973 (3d Cir. 1971). In rejecting a challenge to another arbitration award, moreover, this court has added that "a court is precluded from overturning an award for [the arbitrator's] errors in assessing the credibility of witnesses, in the weight accorded their testimony, or in the determination of factual issues." *NF&M Corp., supra*, 524 F.2d at 759.

This narrow scope of review is mandated by the strong Congressional policy of encouraging the peaceful resolution of labor disputes by means of binding arbitration. In furtherance of that policy, the courts decline to review the merits of arbitration awards so that both employers and unions can be confident in obtaining the decision of the arbitrator for which they have bargained. *See United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596–99, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424 (1960).

To be sure, there are limits to the deference accorded to the arbitrator's decision; the arbitrator may not simply "dispense his own brand of industrial justice," *Honald, supra*, 405 F.2d at 1125, quoting *United Steelworkers of America v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424 (1965). Thus, if an arbitrator's award is made "in manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the shop," 405 F.2d at 1128, the courts will not enforce the award.[7] Otherwise, though, so long as the award "draws its essence from the collective bargaining agreement," *id.*, the courts will defer to the arbitrator's decision, a point which has been reaffirmed repeatedly by this court. *See Sun Petroleum Products Co. v. Oil, Chemical and Atomic Workers International Union, Local 8–901*, 681 F.2d 924 at 928 (3d Cir. 1982); *Mobil Oil Corp. v. Independent Oil Workers Union*, 679 F.2d 299 at 302 (3d Cir. 1982); *ARCO-Polymers, Inc. v. Local 8–74*, 671 F.2d 752, 755 (3d Cir. 1982) (per curiam).

Recognizing that our function is limited to ascertaining whether the arbitrator acted within the scope of the parties' arbitration agreement, the Company argues vigorously that in ordering Pritchard's reinstatement, the arbitrator's decision was unfaithful to the terms of the collective bar-

---

7. There are other grounds for refusing to enforce an arbitrator's award, such as fraud, partiality by the arbitrator, and so on. *See Honold, supra*, 405 F.2d at 1128 n.27. With one exception—inconsistency with public policy, which is discussed in Section II.B., *infra*—none of these other possible bases for refusing to defer to an arbitrator's decision is relevant to the present case.

gaining contract, which the parties agreed would be binding on the arbitrator. According to the Company, the evidence adduced before the arbitrator clearly demonstrated cause for discharging Pritchard under the Company's Rules of Conduct as incorporated in the collective bargaining agreement. In particular, the Company emphasizes that after receiving an order to close the by-pass valve, Pritchard closed both the by-pass and main valves (App. at 313a, 323a); that it was far from easy to close the main valve—indeed, it took several turns with a wrench to do so; that Pritchard's explanation during the arbitration hearing that he closed the main valve in order to save the Company money was incredible; and that Pritchard admitted that he had failed to report closing the main valve. Based on the evidence in the arbitral record, the Company concludes, the arbitrator improperly found that Pritchard acted unintentionally. According to the Company, the record can only be read as demonstrating that Pritchard's actions were intentional and amounted to insubordination, sabotage, and a deliberate restriction of the Company's output.

■ In the circumstances of this case, however, we cannot agree that the arbitrator's determination failed to "draw[ ] its essence from the collective bargaining agreement." In addition, the Company had consented to arbitrate and indeed it consented to the appointment of this particular arbitrator. Moreover, the Company agreed to the Union's characterization of the subject matter of the arbitration; as the arbitrator observed, "[t]he grievance protest[ed] the Company's discharge action as being without proper cause." After hearing all the witnesses' testimony and reviewing all the exhibits, the arbitrator concluded that

Pritchard had simply made a mistake in judgment.

Admittedly, we find it as difficult as does the Company to comprehend the arbitrator's determination that Pritchard merely made a mistake in judgment. At the hearing, Pritchard's sole explanation for his conduct was that he "just thought [he] was saving the Company some money." (App. at 275a). This explanation would indeed appear to leave something to be desired: a gas company does not save money by preventing customers from purchasing its product. Nevertheless, the question whether Pritchard's actions violated the Company's Rules of Conduct, or whether any particular witness was convincing or credible, is not one for the courts to decide once the parties have agreed to submit their dispute to arbitration. After "bargaining" for the decision of this arbitrator, the Company cannot avoid his decision merely because the arbitrator may have reached an incorrect result.[8]

Indeed, in at least two recent cases this court has upheld arbitration decisions which appeared to be at least somewhat questionable under the circumstances there presented. In *ARCO-Polymers, supra,* an employee who had been absent for nearly a month claimed that his absence was due to medical reasons, even though there was practically no evidence that illness had anything to do with his failure to report to work. Under the collective bargaining agreement between ARCO-Polymers and the Union, four consecutive days of absence of work was sufficient cause for discharge. In *Mobil Oil, supra,* an employee fought on the job and compiled such a generally poor work record that, as an arbitrator later noted, a discharge would clearly be appropriate in

---

**8.** While the evidence of "mistake" in the record is minimal, we cannot say that there was no evidence supporting the arbitrator's conclusion that Pritchard made a mistake in judgment. The arbitrator specifically observed that a chronology of events of the valve-closing incident (Joint Exhibit J), prepared by Company Coordinator Michael McCoy, buttressed the credibility of Pritchard's testimony that he, Pritchard, had made a "mistake" and had not acted intention-

ally. The arbitrator also noted that McCoy had admitted during a hearing held by the Pennsylvania Public Utilities Commission to investigate the valve-closing incident, that he believed Pritchard's action to have been a mistake in judgment. Additionally, a Union official testified that the Company's President had agreed that Pritchard had not acted intentionally. (App. at 239a).

the normal case. In both cases, the employer fired the employee, and an arbitrator ordered the employee reinstated, for reasons that according to the employer amounted to the substitution of the arbitrator's "own sense of equity" for the terms of the collective bargaining agreement, *see Mobil Oil, supra*, at 304. And in both cases, this court replied that once an employer "agree[s] to leave to an arbitrator the resolution of disputes whether cause existed for discharge" of the employee, the employer "is bound by [the] award" made by the arbitrator. *Id.*, at 304.

Nor are we persuaded that *International Brotherhood of Firemen & Oilers, Local No. 935-B v. The Nestle Co.*, 630 F.2d 474 (6th Cir. 1980), upon which the Company relies, in any way indicates that the district court erred in refusing to vacate the arbitrator's award. In *Nestle*, an arbitrator found that the grievant refused a direct order of his foreman several times and called the foreman "a son-of-a-bitch" in the presence of the division manager and other employees. Despite the fact that the collective bargaining agreement provided that insubordination "shall constitute cause for dismissal" the arbitrator awarded the grievant reinstatement without backpay. The Court of Appeals reversed a district court order enforcing the award, concluding that the arbitrator ignored his previous specific findings of insubordination in declining to uphold the discharge. *Id.* at 476.

■ *Nestle*, however, merely stands for the proposition—with which we fully agree—that an arbitrator's decision should be vacated when the arbitrator finds facts that constitute grounds for discharge under the collective bargaining agreement, but, in disregard of those facts and the terms of the agreement, refuses to uphold the discharge. *See also International Union of Operating Engineers, Local No. 670 v. Kerr-McGee Refining Corp.*, 618 F.2d 657 (10th Cir. 1980) (vacating award where the arbitrator ignored provision in agreement that made the giving of false statements to obtain sick leave grounds for discharge). In this case, on the other hand, the arbitrator explicitly found that the Company had not proved that Pritchard had acted "intentionally or for the purpose of restricting the flow of gas." (App. at 16a). Thus here, in contrast to *Nestle*, no findings of fact were made that would constitute proper cause for discharge. Indeed, the arbitrator expressly rejected the Company's contentions that Pritchard "was insubordinate in deliberately restricting the flow of gas" or that Pritchard intentionally sabotaged the Company by such an act. (App. at 15a–16a). Rather, as we have noted, the arbitrator found that while Pritchard had acted errantly and beyond the scope of orders, those actions amounted to no more than an error in judgment. And while we have misgivings as to that finding, we cannot say that once it had been made, the arbitrator strayed beyond the four corners of the contract in determining that suspension rather than discharge was the appropriate penalty.[9]

---

**9.** Before the district court the Company apparently raised the question of the propriety of the penalty imposed by the arbitrator. The Company contended that neither the collective bargaining agreement nor the rules of conduct authorized the thirty-day suspension imposed upon Pritchard by the arbitrator. In reference to this argument, the district court held:

[the arbitrator] was entitled to make his own judgment as to the appropriate penalty considering all the circumstances of the case and the law of the shop. While he found the turning off the valve was reckless, he did not find it was deliberate and intentional in the sense that it was an attempt to sabotage the Company's production. There is nothing in the Rules of Conduct which require that on a first offense there be discharge or that that is the only penalty. To enforce such a penalty in all cases would certainly be a draconian form of punishment. The arbitrator interpreted that he had discretion up to discharge under these circumstances and the court cannot fault him for that.

If we were obliged to reach this issue we might very well be persuaded to agree with the district court's analysis. However, the Company has not raised before us the propriety of the particular sanction imposed by the arbitrator. The Company's arguments here raise only the question of Pritchard's discharge, not his suspension. The arbitrator resolved *that* issue by finding that the Company discharged Pritchard without proper cause.

■ Reduced to its essence, then, the Company's argument consists of complaints that the arbitrator incorrectly interpreted the agreement in light of the evidence and that his findings were erroneous. Based on our review of the transcripts and the documentary evidence, we are inclined to agree: the arbitrator's decision was indeed a dubious one. Nevertheless, we are satisfied that the arbitrator stayed well within the confines of the collective bargaining agreement and the submitted grievance. Thus, while we would not have made the findings made by the arbitrator, and would not have evaluated the evidence as he did, we see no basis under the standard established in *Ludwig v. Honold* for disturbing the arbitrator's award. *See also Mobil Oil Corp. v. Independent Oil Workers Union, supra; ARCO-Polymers, Inc. v. Local 8–74, supra.*

#### B.

In a footnote to its opinion in *Honold, supra*, this court suggested that it might decline to enforce an arbitrator's award on the ground of "inconsistency with public policy." 405 F.2d at 1128 n.27. Generalizing the remark in that footnote, the Company argues that an arbitration award ordering reinstatement must be vacated on the ground of inconsistency with public policy whenever the grounds for the grievant's discharge include acts that violate state or federal law. Here, the Company claims that Pritchard's acts violated both federal law [10] and the Pennsylvania policy imposing the "highest degree of care practicable" on operators of natural gas systems, *Karle v. National Fuel Gas Dist. Co.*, 448 F.Supp. 753, 759 (W.D.Pa.1978) quoting *Densler v. Metropolitan Edison Electric Co.*, 235 Pa. Super. 858, 345 A.2d 758, 761 (1975)). *See also* Pa.Stat.Ann. tit. 52, § 59.33. Thus, the Company concludes, public policy requires that we vacate the award reinstating Pritchard.

■ Significantly, however, the *Honold* court was not directly faced with the question of what circumstances would warrant the vacation of an award on public policy grounds. While it is clear that *Honold* subscribed to a "public policy" standard, it is equally clear that such a standard should have application only where an award conflicts directly with federal or state law.[11] Indeed, this was the conclusion of the district court in *General Teamsters, Chauffeurs, Warehousemen & Helpers, Local Union 249 v. Consolidated Freightways*, 464

---

**10.** The Company cites one of the Department of Transportation Regulations setting "minimum safety requirements for pipeline facilities and the transportation of gas," 49 C.F.R. § 192.1. These regulations, the Company points out, provide in part that

> [n]o person may operate a low pressure distribution system at a pressure lower than the minimum pressure at which the safe and continuing operation of any connected and properly adjusted low-pressure gas burning equipment can be assured.

*Id.* § 192.623(b).

**11.** Neither do we find convincing *Black v. Cutter Laboratories*, 43 Cal.2d 788, 278 P.2d 905, (1953), *cert. dismissed*, 351 U.S. 292, 76 S.Ct. 824, 100 L.Ed. 1188 (1956), which the Company and the *Honold* opinion cite. In *Black*, the California Supreme Court held, over a strong dissent by Justice Traynor, that

> an arbitration award which directs that a member of the Communist Party who is dedicated to that party's program of "sabotage, force, violence and the like" be reinstated to employment ... is against public policy, as expressed in both federal and state laws,

> [and] is therefore illegal and void and will not be enforced by the courts.

43 Cal.2d at 798, 278 P.2d at 911. As evidence of the public policy against "the dangers of the Communist movement" the California Supreme Court cited a number of federal and state statutes, even though none of those statutes required the discharge of the employee in question, and despite the fact that the employee had not been charged with violating any state or federal criminal statute.

We have serious questions about the continued vitality of the majority opinion in *Black v. Cutter*, even though we acknowledge that it does support the principle espoused in *Honold*. In our view, Justice Traynor's dissent in *Black* represents a far more reasoned approach. Moreover, we observe that *Black* was filed before the Supreme Court decided in *Textile Workers of America v. Lincoln Mills*, 353 U.S. 448, 456, 77 S.Ct. 912, 917, 1 L.Ed.2d 972 (1957), that federal law governs the review of labor arbitration awards. Because the *Black* court applied principles of *California* common law, that decision in our opinion has little, if any, precedential value today for our purposes.

F.Supp. 346 (W.D.Pa.1979). In that case, a union representing truck drivers sought to overturn two arbitrations in which Joint Area Committees denied grievances filed by drivers. In the grievances, the drivers were protesting the fact that they were obliged to drive tractor-trailers, in one instance without mud guards, and in another, without a trailer plate or owner's card. Relying upon the *Honold* footnote, the district court vacated the award, noting that the Joint Area Committee decisions would oblige drivers to violate the Pennsylvania Motor Vehicle Code, Pa.Stat.Ann. tit. 75, §§ 1301, 1331–33, 4533. The court held that enforcement of the arbitration award would have, in essence, sanctioned violations of the Pennsylvania Motor Vehicle Code.

*Consolidated Freightways* stands for the proposition that an award is inconsistent with public policy when it would condone violations of federal or state law. The decisions of other circuits suggest that absent such a finding that an award condones a violation of federal or state law, the strong federal policy of encouraging labor arbitration dictates the enforcement of arbitration awards. For example, in *International Association of Machinists, District No. 8 v. Campbell Soup Co.*, 406 F.2d 1223 (7th Cir.), *cert. denied*, 396 U.S. 820, 90 S.Ct. 57, 24 L.Ed.2d 70 (1969), the Seventh Circuit rejected a public policy attack on an award ordering reinstatement without back pay of an employee who had pleaded guilty to a misdemeanor violation of state gambling laws for taking bets on company premises. The court concluded that the employee's conviction and his failure to obtain back pay sufficiently vindicated Illinois penal law, and that neither state nor federal law required the arbitrator to uphold the discharge. *Id.* at 1227. *Campbell Soup* relied

upon *Local 453, International Union of Electrical, Radio & Machine Workers v. Otis Elevator Co.*, 314 F.2d 25, 29 (2d Cir.), *cert. denied*, 373 U.S. 949, 83 S.Ct. 1680, 10 L.Ed.2d 705 (1963), in which the Second Circuit enforced an arbitration award, holding that enforcement would not amount to judicial condonation of the employee's illegal gambling since the award subjected the employee to a seven-month suspension.

Consideration of *Consolidated Freightways, Campbell Soup,* and *Otis Elevator* convinces us that only if upholding an award would amount to "judicial condonation" of illegal acts, should the award be vacated on grounds of inconsistency with public policy. Here, however, it cannot be argued that enforcement of the arbitrator's award, which while reinstating Pritchard did provide for a penalty, would amount to "judicial condonation" of illegal acts. The award does not let Pritchard's actions go unpunished; [12] rather, it subjects Pritchard to a thirty-day disciplinary suspension. The Company has not brought to our attention any federal or state law that would compel the harsher sanction of discharge, no doubt because no such law exists. Thus, we conclude that the award here cannot be vacated on the ground that it is inconsistent with public policy.

### III.

We turn now to the issue of attorney's fees raised by the Union. In the recent case of *Mobil Oil Corporation v. Independent Oil Workers Union*, 679 F.2d 299 (1982), this court addressed the same issue under similar circumstances. There, Mobil Oil had fired one of its employees, and the union submitted the dispute to arbitration and the arbitrator found for the union. Af-

---

**12.** The arbitrator concluded:
   Certainly if it were shown that the Grievant had in fact acted intentionally and for the purpose of restricting the flow of gas, the "gravity" of the matter would dictate his removal from the work force. Since the record in major portion establishes the Grievant's act to be one of inadvertence, albeit, reckless, a penalty lesser than discharge must prevail and the Grievance must be sus-

tained to the extent provided for hereinbelow.
   \*   \*   \*   \*   \*   \*
   The grievance is sustained to the extent that the Grievant is to be reinstated with effect from thirty days following the date of discharge. The period running from the date of discharge to the date of reinstatement shall be treated as a Disciplinary Suspension.
   (App. at 16a–17a).

ter Mobil Oil filed a suit in the district court to vacate the award, the district court granted the union's motion for summary judgment but denied the union's request for costs and attorney's fees. Both the union and the company then appealed.

In upholding the district court's denial of attorney's fees, this court stated:

Under the American rule, each party normally must bear the burden of its own legal expenses, including attorneys' fees. One of the narrow exceptions to this rule is a finding that the losing party litigated in bad faith, vexatiously, or for oppressive reasons.

*Id.,* at 305. We must determine, therefore, whether the district court here, after reviewing the relevant authorities and the record before it, abused its discretion when it found that "no factors have been called to our attention justifying a fee award because the plaintiff's actions were in bad faith, vexatious, wanton or oppressive."[13]

▮▮ In its brief, the Union has pointed to no facts upon which a holding that the district court abused its discretion in denying attorney's fees could be based.[14] In addition, we note that the fact that the Company challenged the arbitrator's award on the merits is not by itself sufficient to justify a grant of attorney's fees to the party seeking enforcement of the award. *Id.,* at 305. Thus, we reject the Union's challenge to the district court's denial of its petition for attorney's fees.

### IV.

We conclude that the limited scope of our review does not permit us to vacate the arbitrator's award, and that that award offended no public policy. Additionally, we hold that the district court did not abuse its discretion in denying attorney's fees to the Union. Accordingly, we will affirm the district court's order (at No. 82–5114), which enforced the arbitration award by granting summary judgment in favor of the Union, and we will also affirm the order of December 23, 1981 (at No. 82–5115), which denied the Union's application for attorney's fees.

ADAMS, Circuit Judge, concurring.

While I share the majority's concern that federal courts not intrude, except in extraordinary circumstances, in the arbitral process—and while I agree that this case does not present the sort of "extraordinary circumstances" that, under *Ludwig Honold,* warrants the abandonment of judicial restraint—I write separately to express my discomfort at the unfortunate result reached today.

Judge Garth has aptly set forth the exceedingly narrow standard to which we must adhere in reviewing the arbitrator's decision. Applying this standard, Judge Garth concludes—correctly, I believe—that this Court is without power to disturb the arbitrator's findings and conclusions. Regardless of how impeccable this analysis may be from a legal perspective, however, I have no doubt that the citizens of Kane when they learn of our decision will be astonished at the result. While we may

**13.** Neither party included the district court's opinion of December 13, 1981, in its submissions to this court. Where our standard of review requires us to examine the exercise of the district court's discretion, it should be obvious to the parties that the district court's opinion is essential to our consideration. Indeed, Fed.R.App.P. 30(a) specifically states that "[t]he appellant shall prepare and file an appendix to the briefs which shall contain ... the judgment, order or decision in question." *See also* Third Circuit Rule 10(3) (same). In this case, having obtained the district court's opinion through our own efforts, and observing that the cross-appeal presents no difficult questions on the merits, we need not determine whether

the failure to comply with Rule requirements is sufficient to warrant dismissal under the standard set forth in *Kushner v. Winterthur Swiss Ins. Co.,* 620 F.2d 404, 405 (3d Cir. 1980).

**14.** Further, the district court held that

[t]he only argument made is that the parties should abide by the national policy in favor of arbitration, and that the party who contests an arbitration award in Court should pay attorney's fees to a prevailing party. This may be a good policy but we do not find it to be the law.

Opinion of the District Court in No. 80–53 (December 23, 1981), at 2. We agree.

justify our decision as reflecting a national commitment to arbitration, or perhaps simply as the inevitable outgrowth of a line of judicial precedent, the fact remains that today we condone the reinstatement of a person whose actions, advertent or not, very nearly had disastrous consequences.

The problem, as I see it, lies not in the legal principles enunciated in *Ludwig Honold*, or even in the rather questionable judgment of the arbitrator—for bad judgment is a risk our system assumes when it subjects arbitrators' decisions to such limited scrutiny—but rather in the contract entered into by Kane Gas that required the company to prove "sabotage," "espionage," or "deliberate restriction of output" before it could subject an employee to a first-offense penalty of discharge. *See* Appendix at 322a. Had the company's burden been lesser—had the company, for example, been required only to show negligence or recklessness—I have little doubt that Alan Pritchard would not be returning to his post. (Indeed, the arbitrator in this case found that Pritchard's act had been "one of inadvertence, albeit, reckless." Appendix at 16a.) I am both surprised and disturbed that a Kane Gas employee may *not* be dismissed for reckless inadvertence when the conduct in question poses a serious hazard to the lives of the citizens. In such a high-risk occupation, with the safety of entire communities at stake, it would appear prudent, if not essential, for the company to have insisted upon a provision in its contract that would have permitted the discharge of a grossly errant, albeit not intentionally destructive, employee.

In the absence of such a provision, and in view of the rule of judicial deference to arbitrators' decisions, I am bound to arrive at the result reached by the majority.